WILLIAM J. DAWSON v. THE IRON RANGE & HURON BAY RAILROAD COMPANY, AS GARNISHEE OF WALLACE DINGMAN.

*Partnership—Railroad companies—Garnishment by creditor of contractor—Labor claims.*

GRANT and LONG, JJ., favor an affirmance of the judgment below, in which *result* MONTGOMERY, J., concurs, and hold:

 a—That there was evidence justifying a finding that the money sought to be reached by the garnishment proceedings belonged to a partnership of which the principal defendant was a member, and was not subject to garnishment for his individual debt.

*b*—That the garnishee defendant had the right, under How. Stat. § 3423, to withhold the money for the protection of the labor and material men who held claims against the partnership.

Case made from Calhoun. (Hooker, J.) Argued February 15, 1893. Decided July 26, 1893.

Garnishment proceedings. Plaintiff assigns error. Affirmed. The facts are stated in the opinion,

*Cowles & Jerome (Henry M. Duffield,* of counsel), for appellant.

*Wells, Angell, Boynton & McMillan,* for garnishee defendant.

GRANT, J. This case was tried before the court without a jury, and the court made findings of fact and law as follows:

"FACT.

"1. On March 21, 1892, the plaintiff recovered a judgment in said court against Wallace Dingman, the principal defendant, of $4,000 damages and costs.

"2. The writ of garnishment in this case was served upon the garnishee defendant on the 7th day of August, 1891.

"3. On the 16th day of August, 1890, a contract was made in writing between said Wallace Dingman and the garnishee defendant for the grading of a railroad. Said contract is a part of the record, and a copy is attached to this finding, and, though executed by said Dingman and one James M. Turner, it was the contract of the garnishee defendant, and was so understood and interpreted by the parties.

"4. Said contract provided for the payment by the garnishee defendant to said Wallace Dingman, 'his surviving partners,' etc., certain prices therein set forth for the work, upon monthly estimates of the work done, 15 per cent. of such estimates to be reserved until the completion of the work. The contract provided that payments were to be made under such regulations as should be agreed upon, and at such place as the garnishee defendant should appoint.

"5. Some months before the writ in this case was issued, defendant Dingman notified the garnishee defendant that George L. Davis and he were partners in the work, and were to share in

the proceeds. Both subsequently worked upon said job, and in at least one instance money was paid by the garnishee defendant to said Davis.

" 6. Previous to the service of said writ, monthly estimates of the work done were made, all of which had been duly paid (less the 15 per cent.), except a portion of the July estimate, for work done in June. Of this the sum of $8,532.18 remained in the hands of the garnishee defendant at the time the writ was served. No estimate had at that time been received for the work done in July.

" 7. On August 9, 1891, defendant Dingman stopped work for the reason that he had not means to carry it on, most of his implements having been seized upon chattel mortgage.

" 8. On August 10, 1891, $8,000 was sent north by the garnishee defendant to pay the wages of laborers upon said work. At the same time the sum of $16,467.82, applied against the estimate for work done in July, was sent. This money was paid upon the pay-rolls of June and July. Subsequently the balance of the pay-roll for work done in July (some $4,000), and $5,000 more, was paid by the garnishee defendant upon the labor claims, more than covering the reserve of 15 per cent. provided by said contract.

" 9. The pay-rolls upon which funds were paid were furnished by Dingman, and such payment was in accordance with the usage of the parties during the progress of the work, and also the express consent of Dingman, as shown by his letter of July 28, 1891.

" 10. On May 15, 1891, an order for $10,029.94, given by Dingman to the Michigan Slate Company, was presented to the garnishee defendant by said Turner, with a request that the same be paid. This order was signed: ' Wallace Dingman, by order Geo. L. Davis;' and ' Wallace Dingman. O. K.' Payment was refused on the ground that nothing was due to the contractors. It was filed, with the promise that it should be protected, if it could be, by the garnishee defendant. It has not been paid.

"LAW.

" 1. The garnishee defendant is a party to the contract, both by its terms and as shown by the interpretation of the parties.

" 2. Under this contract the principal defendant and George L. Davis (after notice of their partnership), as partners, had a right to payment of what might afterwards become due upon it.

" 3. Such fund could not lawfully be subjected to garnishment for the debts of Dingman.

" 4. Under the statute (How. Stat. § 3423) the garnishee defendant had a right to withhold from the principal defendant, for a reasonable time, a sum sufficient to pay outstanding labor and material claims, and until furnished by defendant Dingman and his partner with the pay-rolls in the usual course of business.

"5. This, being a right that might lawfully be asserted against the contractors, was equally valid against the plaintiff.

"6. It appearing that no amount in excess of such claims has at any time been owing to the principal defendant by the garnishee defendant, the fund in its possession at the time the writ was served was not subject to garnishment at the suit of the plaintiff. The defendant is entitled to judgment for costs."

The liability of the garnishee defendant is contested on four grounds, viz.:

1. A partnership existed between the principal defendant and George L. Davis.

2. The funds were lawfully withheld by virtue of the statute.

3. The funds were subject to the regulations adopted by the contracting parties, and were subsequently paid out by the garnishee defendant in accordance therewith.

4. The contractor was in default at the time of the service of the writ, and it was uncertain whether anything would become due.

The findings of fact by the court stand upon the same basis as the verdict of a jury, and, if there is any evidence to sustain the findings, this Court will not review it.

1. The contract, though made with Dingman alone, contemplated that a partnership might be formed, for it expressly provides for payments to him or "his surviving partners." All the evidence in the case was introduced by plaintiff, and, aside from the written evidence, was given by Mr. Pierce, the accountant for the garnishee defendant, and Mr. Dingman, the principal defendant. Dingman was in possession of all the facts, and yet was not asked about the partnership. It is apparent that he was hostile to the garnishee. Plaintiff's counsel, in the examination of his witnesses, avoided all reference to the partnership of which the garnishee, under oath, in its answer, alleged it had been served with notice. The burden of proof was upon the plaintiff to establish an indebtedness from it to Dingman alone. If his evidence disclosed a state of facts equally consistent with agency for Dingman and a partner-

ship with him, he must fail, for it was clearly his duty to show which it was, and he cannot cast the burden upon the garnishee to show it. Now, the evidence clearly disclosed some relation between Dingman and Davis, which was either that of agency or interest as a partner. The evidence disclosed that Dingman and Davis asked defendant garnishee to send checks to those at work upon the job; that money was paid to Davis; that Davis signed time checks; that Dingman and Davis went to Detroit, the principal office of the company, and then and there, at the request of both, debts of the contractors were settled and paid. Davis' presence on this occasion is hardly consistent with the theory that he was agent for Dingman. A principal does not usually require the presence of his agent when he is attending to the business himself. I therefore conclude that there was some evidence tending to show partnership, and that this Court should not disturb the finding.

2. I think the funds were properly withheld under the statute. The statute expressly authorizes railroad companies to withhold payment until the laborers and material-men are paid. The proviso is as follows:

" *Provided further*, that a bill of items of the material and labor furnished to said contractor or subcontractors shall be furnished to the company through their agent, or otherwise, together with the amount claimed, prior to the usual pay-day of said company when such claim shall be due, or, in case the contractor or contractors are not then paid, then prior to the payment then due." How. Stat. § 3423.

The plaintiff, by his garnishee proceedings, cannot be placed in other or different position than his debtor. He succeeded to the same rights that his debtor possessed. Therefore if, under the statute, the debtor could not enforce payment, neither could the plaintiff. Section 2 of the act provides that the laborers and material-men shall

have the right to collect pay from the companies by action if the claims are undisputed. Section 3 provides that, if disputed, the companies shall withhold payment until it has been adjudicated before some court of competent jurisdiction, and upon the rendition of judgment in favor of the claimant the company is required to pay it. Could Mr. Dingman, at the time of the service of the writ, have sued the company, and recovered judgment, without having paid the laborers? We think not; otherwise the statute would be meaningless and ineffective. Its object is to protect the laborers and material-men, and to secure to them the payment of their just claims, and to authorize the companies to withhold payment till that object is accomplished. If Dingman had brought suit, and afterwards, and before judgment, bills of items had been furnished by the laborers, we do not think he could recover for the amount of such claims without having provided for their payment. Such is the evident meaning of the statute, for it says that it shall be sufficient if such bills of items be furnished at any time before the money due the contractor is paid to him. In July the company had notice that the laborers on the June pay-roll had not all been paid, but, on the contrary, there was then due for labor more than the amount due Dingman or Dingman & Davis on the contract. This pay-roll was a sufficient bill of items under the statute.

This question was not involved in *Dudley v. Railway Co.*, 65 Mich. 655, 659, nor the question of voluntary payment of such claims by the company. The following statement in that opinion must therefore be regarded as *dictum*, viz.:

" No provision is made for voluntary payment by the company to the laborer or material-man, but they are permitted to collect pay for the claim by action against the railroad company."

Nor need the question of payments without suit, under

this statute, where the claims are undisputed, be here considered. It is only necessary to determine whether the company had the right, at the time of the service of the writ, to withhold these payments for the protection of the laborers. If it had this right, it cannot be defeated by showing that subsequently the company paid the claims. No doubt is raised as to the validity of the claims of the laborers, or as to the good faith of the company. We think the findings of the circuit judge in this regard are correct.

3. The contract provided that the amount of monthly estimates should be "paid under such regulations as may be agreed upon between the parties, and at such place as the party of the second part may appoint." Under this provision the parties to the contract, during the several months of its execution, had established a method of payment, not by any written regulations, but by common consent and custom. By this method the company sent currency from Detroit to the place of construction, and the laborers were first paid under the direction of one of its officers. This method was pursued upon the June estimate, which showed to be due on the contract $84,543.04, of which sum $35,000 had been sent in currency. This proving insufficient, the officer of the company sent to make the payments drew his check for $10,000, which was used for the like purpose, and paid in the same manner. As already shown, these were not sufficient to pay the labor claims, and before any other money was sent for that purpose the writ of garnishment was served. We think the method of payment so established was binding upon Dingman and the company. It is equally binding upon those who claim under him. If he could not repudiate it, neither can plaintiff.

Judgment affirmed.

LONG, J., concurred with GRANT, J.

MONTGOMERY, J., concurred in the result.

McGRATH, J. *(dissenting)*. Plaintiff brought *assumpsit* against Wallace Dingman, and garnished the Iron Range & Huron Bay Railroad Company. The garnishee defendant answered, denying any indebtedness to the principal defendant, and setting up that on August 16, 1890, said Dingman entered into a written contract with the garnishee, by the terms of which Dingman agreed to construct a certain railroad, and to complete the same on or before the 1st day of August, 1891; that, on the first day of each month during the progress of the work, a monthly estimate should be made of work done during the preceding month; that on the 15th of each month said Dingman, his surviving partners, executors, or administrators, should be paid in current paper at L'Anse, Baraga county, or at Champion, Marquette county, 85 per cent. of such estimate; that on the completion of the work, Dingman, upon giving a release from all claims or demands whatsoever, should be paid the 15 per cent. which had been reserved; that in case of Dingman's default the company should have the right to declare the contract forfeited, and retain the 15 per cent. as liquidated damages. And it was further expressly agreed that the company should at any time have the right, without fault on the part of Dingman, and for any reason whatever that might appear sufficient to the said company, upon giving 30 days' notice thereof to said Dingman, to suspend the execution of or annul the contract, in which event the said Dingman should be entitled to the full amount of the estimate of the work done by him up to the time of such suspension or annulment, without the deduction of the amount retained, as heretofore mentioned, but with the condition that all persons performing labor or furnishing material under said contract with said Dingman should first be paid, and whatever balance might be found due would be paid to

said Dingman; and such suspension or annulment should not give to said Dingman anything for damages against the company. The answer further sets forth:

" That, some months before the service of the said writ of garnishment, said Dingman informed this deponent, as the agent and representative of said company, that he had joined with himself one George Davis as a partner to prosecute the work with him, and to share with him the proceeds thereof under the terms of the said contract; that large sums of money were from time to time paid by the said company, in accordance with the terms and provisions of the said contract, and in payment of the estimates made by the engineer, as provided in said contract, and that the only money held back by said company at the time of the service of the said writ was the 15 per cent. reserve, as provided in said contract; that at the time of the service of the said writ the said railroad was not completed in accordance with the provisions of the said contract, but that a very large portion of the work was, and is still, incomplete, and that since the service of the said writ said contractor became financially embarrassed and irresponsible, so that he could no longer continue in the proper prosecution of the work, and that said work had to be stopped; that the estimate of the chief engineer, as provided for in the said contract, for July work, had not been received by said company at the time of the service of the said writ, but that it has since been received, and the entire amount thereof has been paid by the company in accordance with its duty under the statutes of said State, and in pursuance of the terms and provisions and intent of said contract, to those furnishing labor and material for the construction of said road to said contractor and his subcontractor; that over and above the amount of the July estimate, paid as aforesaid, a sum of money greatly exceeding in amount said 15 per cent. reserve, and entirely beyond any liability of said company under said contract, has been applied by said company since the service of said writ in payment of labor and material claims presented to said company for payment of labor and material furnished to said contractor or his subcontractors in the construction of said road, and that many such claims are still outstanding and unpaid."

A further examination was had under the statute, after

which a trial was had before the court without a jury. The findings of fact and law are set forth in full in the opinion of Mr. Justice GRANT.

The plaintiff excepts to the fifth finding of fact, insisting that there is no evidence upon which to support it. The contract was entered into with Dingman, and the accounts were kept with Dingman during the entire time. The vouchers were issued to Dingman, and the moneys paid on the contract were charged to him. The corres-'' pondence was had with Dingman. The receipts to the company were signed by him. The construction blanks were headed: "Iron Range & Huron Bay R. R. Wallace Dingman, Contractor." The time checks were so headed, were signed by the foreman of each camp, and were transferable when countersigned by Wallace Dingman. An order which had been received by the garnishee defendant, and to which reference will be made hereafter, was as follows:

"ARVON, MICH., May 15, 1891.
"*Iron Range & Huron Bay R. R.:*
"Please pay to the Michigan Slate Co.. the sum of $10,029.94, balance of amount due on account, and charge the same to *me.*                    WALLACE DINGMAN,
"By order of George L. Davis."
Indorsed:  "WALLACE DINGMAN.  O. K."

Why signed in this manner, or why "charge the same to me," or why O. K.'d by Dingman, if Davis was interested as a partner?

On July 8, 1891, Dingman sent to the company a list of creditors, with the amount due each. This list aggregated $49,636.23. Entered upon this list were partial payments, aggregating nearly $14,500, made by the company, at Dingman's request, to the parties named. Plaintiff's claim, stated at $5,500, would seem to be upon this list, and it was reduced by the payment thereon of $1,000; but, whether this was so or not, a further memorandum was received by the garnishee, which is as follows:

"WALLACE DINGMAN.

"W. J. Dawson, Dr.

"Account to date, July 1----------------------$6,266.74. "

This memorandum Dingman presented to Pierce, the company's accountant, who testifies in relation thereto as follows: "He [Dingman] said that was the amount he wanted to pay Dawson. He wanted to pay the others too. Dawson's account came in just the same as the others."

On July 28, 1891, Dingman, Milo Davis (who was the company's engineer), and George L. Davis came to Detroit, and Dingman gave to the garnishee defendant the following authorization:

*"Iron Range & Huron Bay R. R. Co.:*
" I hereby authorize you to pay the balance due on the June estimate, of twenty-four thousand two hundred sixty-six dollars and seventy-one one-hundredths ($24,266.71), and this is my receipt for the same.

"WALLACE DINGMAN."

On that day $15,734.53 was paid out by the garnishee defendant through Pierce. Pierce's testimony is conflicting as to whom the currency portion of this money was paid. He says:

"Part of the balance was paid Geo. Davis. Milo Davis came down here, and I paid him $8,000, and I afterwards sent up a check for the balance,—all that was due. That left a balance of $24,266.71, and he instructed us to pay that, and Geo. L. Davis went up to the bank, and we sent by him checks for the balance. I gave him $8,000 in cash, and checks for the balance. I gave him $8,000 in cash, and checks for $7,734.53, amounting in all to $15,734.53. This was on the 28th day of July."

Again he says:

" That $8,000 was paid to George and Milo Davis at the Detroit National Bank.

" Q. On the same day checks were issued amounting in the aggregate to $7,734.53. Whom were the checks payable to?

" A. Well, they were paid upon the request of Mr.

Dingman and Mr. Davis, to settle the debts of the contractors."

On August 8, 1891, the day after the service of the writ of garnishment, Pierce wrote to Dingman as follows:

*"Dear Sir:* Voucher No. 689, to W. Dingman, as corrected, was for $84,543.04.

On which was paid—

| | | |
|---|---|---:|
| currency, per H. S. | | $35,000 00 |
| "             M. Davis | | 10,000 00 |
| "                      " | | 8,000 00 |
| checks, 13 July | | 15,276 33 |
| "       28    " | | 7,734 53 |
| | | $76,010 86 |

"Balance unpaid on voucher No. 689, $8,532.18.

"The $1,537 pd. Houghton Nat. Bank was paid out of the currency, making, with the $3,500 check, the sum of $5,037 paid H. N. B."

It will be seen by this letter that the $8,000 in currency was paid to Milo Davis, and the inference is plain that out of that currency Milo Davis paid $1,537 to the Houghton National Bank.

The only evidence that George L. Davis worked upon the job is what might be inferred from the testimony already referred to, and the question put to Pierce relative to the time checks. He was asked if some of these checks were not signed by Dingman, some by George L. Davis, some by the foreman, and some by the subcontractor, and Pierce answered:

"Yes; the time checks issued by each camp were signed by the foreman of that camp. This man Rook [who signed the check referred to] was foreman of that camp, I suppose."

There was no testimony as to the capacity in which Davis worked upon the job. Even though it be conceded that he received the $8,000, there is no testimony tending to show that he received it as a partner. Neither the receipt of this money, which was paid out upon the job,

nor the fact that he worked upon the job, tended to show that he was a partner.

The circuit judge seems to have laid stress upon the statement made in the disclosure that Dingman had said that Davis was a partner. In proceedings before a justice of the peace the disclosure is conclusive as to the liability of the garnishee, and the same is true of a disclosure made in the circuit, unless issue is taken thereon; and this is so although the statements made in the disclosure are upon information and belief. But no such force or effect is given to a disclosure where an issue is raised and a trial had. *Fearey v. Cummings*, 41 Mich. 376. As is said by COOLEY, J., in *Allen v. Hazen*, 26 Mich. 142, " the disclosure does not stand upon the same footing as the testimony of a witness. It is the answer of a party. * * * * It is somewhat analogous in its function to an answer in chancery. Whatever is admitted by it the plaintiff may treat as established." *Page v. Smith*, 25 Me. 256; *Moor v. Towle*, 38 Id. 133. The issue is raised by the affidavit for the writ and the disclosure. So far as any statement made in the answer is hearsay, it must be treated as a pleading, rather than as evidence. The proceeding upon the trial has ceased to be a mere summary proceeding, entitling the garnishee to invoke even rumors for his own protection. It has become a trial, subject to trial rules. The garnishee occupies a relation to the proceeding similar in most respects to what he would if sued by his creditor, and if the facts proven would warrant a judgment against the garnishee in a suit by the principal defendant it will be sufficient to charge him. 8 Amer. & Eng. Enc. Law, 1212, 1232. If the proofs disclose an indebtedness to the principal defendant, and the garnishee seeks to discharge himself by pleading some special matter in avoidance of such liability, the burden is upon him to relieve himself. Id. 1208–1227.

In the present case the plaintiff had clearly shown that the contract was entered into with Dingman; that all the dealings had been with Dingman; that the vouchers were made out to Dingman; that the receipts were signed by Dingman; that the accountings were had with Dingman; that the job was conducted and carried on in Dingman's name; that the garnishee defendant had nowhere recognized Davis as having authority; that plaintiff's claim, upon which Dingman alone was liable, was presented to the garnishee defendant by Dingman as one of the claims to be paid out of the proceeds of the job, and that only a month before the writ of garnishment was served. The liability under the contract was thus clearly established. The principal defendant was sworn, but no attempt was made by the garnishee defendant to show that any partnership existed. Under this state of facts, the naked statement in the disclosure does not rise to the dignity of evidence, and the garnishee will not be allowed to invoke it as a defense.

The ninth finding of fact is without support in the record. The only lists or *memoranda* sent to the company by Dingman were those already referred to. It is not claimed that the balance on hand, or any part of it, was paid to persons named in said lists. No bills of particulars had been received relating to any of the claims listed. Pierce testifies that no bills of items or time checks were received until after the garnishment; that "we had nothing to do with Dingman's pay-roll,—we simply had the figures;" that the first pay-roll that he saw was that upon which Russell, the company's agent, had, after August 9, paid out the money, and he did not see that until after the money had been paid upon it, and that roll was received by Russell from Dingman's bookkeeper as a voucher for money paid out. Pierce further testifies that "upon hearing how much money was needed in currency each month

by Dingman to pay the men, and how much in checks to pay other parties, we sent it up, and telegraphed to our engineer to see that the money went to the men.". This was the only course pursued until after the writ of garnishment was served. The authorization signed by Dingman on July 28 does not appear to have been accompanied with any express instructions as to whom the money should be paid, except that on that day the company paid out at Dingman's suggestion nearly $16,000, and the amount so paid out was the only amount accounted for to Dingman in the company's letter of August 8, and it was not until after the writ of garnishment was served that the company undertook or claimed the right to pay out any portion of the balance. The only fair inference that can be drawn from the transaction is that that money was to be paid out in pursuance of instructions from Dingman, and at least until those instructions were given the balance was subject to garnishment by plaintiff.

The order referred to in the tenth finding of fact was not accepted by the company. The testimony of the accountant relative thereto is as follows:

"*Q.* Now, Mr. Pierce. I have in my hand an order dated May 15, 1891. When did you receive that order for filing?

"*A.* On the 25th of May.

"*Q.* It was not paid by the railroad company?

"*A.* It was not; no, sir.

"*Q.* But it was received and filed?

"*A.* I said I would put it on file, but would not pay it.

"*Q.* You refused to pay it at that time because you did not have the money?

"*A.* I refused because we did not owe Mr. Dingman anything.

"*Q.* But it was left here with the understanding that if it could be protected some time subsequently it would be?

"*A.* I told Mr. Turner he could leave it here, and after me had settled with Dingman, if there was anything coming to Dingman, I would help him out. I did not make any promises beyond that.

"*Q.* Do you mean by that, if there was anything due Dingman after paying labor and material claims?

"*A.* I told him we had nothing but the reserve due Dingman, which we retained until the road was completed, according to the contract. If, after that, there was anything coming to Mr. Dingman, I would do what I could for him. Over and above the 15 per cent. we did not owe him anything. We did not owe him that until the road was completed. That was why I would not accept this."

It cannot be contended that this transaction gave that order a preference, and clearly not as to the fund sought to be reached by plaintiff.

The fourth conclusion of law cannot be sustained. The section of the statute referred to was fully considered and construed in *Dudley v. Railway Co.,* 65 Mich. 655, 659. CHAMPLIN, J., there says:

" The statute imposes a new duty upon the railroad company, not that it shall pay the claims of laborers and material-men on the failure or neglect of the contractors to do so, but the duty imposed is to retain in its custody the amount due from it to its contractors, not exceeding the amount of the claims furnished, until such contractors or subcontractors pay such claims. It is, in effect, a garnishment or stop-order of the amount due to the contractor. No provision is made for voluntary payment by the company to the laborer or material-man, but they are permitted to collect pay for the claim by action against the railroad company."

The proviso which concludes the section applies to all that precedes it. No bills of items of labor and material had been furnished to the railroad company before the service of the writ of garnishment. Had no process been served, the company would have been safe, as against any such claims, in paying to Dingman on that date the balance of the June estimate. The statute does not leave the payment of the labor or material claims optional with the railroad company, nor entitle it to retain moneys due by the terms of its contract, unless the provisions of the act have

been complied with. The right to retain the money depends upon the company's liability to the labor and material men. The intention of the statute is to make moneys in the hands of the company subject to the payment of claims for labor and materials until after pay-day, and, so long as other rights have not intervened, up: to the time of actual payment to the contractor. The garnishee is liable to the garnishing creditor to the extent of his claim from the time of the service of the process. Such service effects an appropriation, by operation of law, of the fund to the satisfaction of the demand of the garnishing creditor. It is, as to the third persons who have not acquired a lien, equivalent to a payment to the principal defendant.

The judgment should be reversed.

HOOKER, C. J., did not sit.